IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:09-HC-2076-FA

UNITED STATES OF AMERICA,

      Petitioner,

v.                                    **FINDINGS OF FACT AND**
                                       **CONCLUSIONS OF LAW**

JOHN BLANFORD KING,

      Respondent.

**INTRODUCTION**

By Judgment Order entered March 29, 2013, the court ordered Respondent, John Blanford King, committed to the custody of the United States Attorney General as a sexually dangerous person pursuant to 18 U.S.C. § 4248(d). The reasons for that decision follow.

The United States seeks to commit Respondent, John Blanford King, as a "sexually dangerous person" under the civil commitment provisions of the Adam Walsh Child Protection and Safety Act of 2006 (the "Adam Walsh Act" or the "Act"), Pub. L. No. 109-248, 120 Stat. 587 (codified as amended in scattered provisions of 18 and 42 U.S.C.). The Act established a program for the civil commitment of individuals in the custody of the Federal Bureau of Prisons ("BOP"), and others, who are determined to be "sexually dangerous person[s]." 18 U.S.C. § 4248(d). The commitment process is initiated when either the Attorney General, the

Director of BOP, or their designee files a certification that an individual is sexually dangerous pursuant to the Act. 18 U.S.C. § 4248 (a); <u>United States v. Timms</u>, 664 F.3d 436, 439 (4th Cir. 2012). Following certification, the district court must conduct a hearing to determine if the person is sexually dangerous. 18 U.S.C. § 4248(a). "If, after the hearing, the court finds by clear and convincing evidence that the person is a sexually dangerous person, the court shall commit the person to the custody of the Attorney General." 18 U.S.C. § 4248(d).

To commit Respondent, 18 U.S.C. § 4248 requires the government to prove by clear and convincing evidence that the Respondent is a "sexually dangerous person." Under the Act, a "sexually dangerous person" is one who "has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C.A. § 4247(a)(5). The phrase "sexually dangerous to others" means that "the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). Thus, to satisfy the criteria for civil commitment under § 4248, the government must show by clear and convincing evidence that an individual: (1) has previously "engaged or attempted to engage in sexually violent conduct or child molestation"; (2) currently "suffers from a

2

serious mental illness, abnormality, or disorder"; and (3) "as a result of" such condition, "would have serious difficulty in refraining from sexually violent conduct or child molestation if released."  18 U.S.C. § 4247(a)(5), (6); see <u>United States v. Comstock</u>, 130 S.Ct. 1949, 1954 (2010).

This court held an evidentiary hearing in this matter on September 13, 2012.  At the hearing, the United States presented testimony from Dr. Gary Zinik and Dr. M. Lela Demby.  Respondent presented testimony from Dr. Joseph J. Plaud.  Respondent King chose not to testify or attend the hearing.[1]  The United States offered twenty exhibits into evidence and Respondent offered thirteen.  With the exception of Government Exhibit 20, all exhibits were admitted.  Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the court makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

**I.   Procedural Facts**

1.   On June 8, 2009, a Certificate of Sexually Dangerous Person was filed against Respondent in the United States District Court for the Eastern District of North Carolina.  DE No. 1.  The Bureau of Prisons certified Respondent John Blanford King as a sexually dangerous person under the Act.  See <u>id.</u>

---

[1] Respondent's Waiver of Appearance was filed on September 5, 2012.  Docket Entry ("DE") No. 61.

2.    On January 28, 2011, Respondent filed a Motion for a Hearing to determine whether Respondent qualifies as a "sexually dangerous person" under the Act.  DE No. 11.

3.    On May 6, 2011, Magistrate Judge James E. Gates granted Respondent's Motion for a Hearing.  DE No. 19.

4.    On June 1, 2012, Chief Judge James C. Dever III set the evidentiary hearing in this matter for September 13, 2012.  DE No. 55.

## II.  Personal Background

5.    Respondent was born on April 23, 1955 and is 57 years old.[2]  See Government Exhibit No. 10, at 1 ("Govt. Ex. _____, at _____").

6.    Respondent states that he was sexually molested at between 10 and 11 years of age by his school nurse.  According to Respondent, the nurse removed his clothes and orally copulated him.  See Govt. Ex. 3, at 3; Respondent Ex. 1, at 4 ("Resp. Ex. _____, at _____").  Respondent reports telling his mother about the abuse but contends she didn't believe him.  See Govt. Ex. 3, at 3; Resp. Ex. 1, at 4.

7.    Respondent also exposed himself to an adult female neighbor on multiple occasions when he was between 12 and 13 years old.  See Resp. Ex. 1, at 5; Govt. Ex. 19, at 32-33; Govt. Ex. 3, at 4.  This behavior lasted for approximately one year.

---

[2] He was the same age at the time of the hearing.

4

See Govt. Ex. 3, at 4. According to Respondent, "I did it every morning before going to school – it felt so good." Id.

8. Respondent's first consensual sexual experience occurred when he was 17 years old and involved sexual intercourse with a 19-year-old female. See Resp. Ex. 1, at 4.

9. Respondent has been married twice. See Resp. Ex. 1, at 5. During his second marriage, he had fantasies about exposing his penis to females in the neighborhood. See id. Respondent also reported that he had extramarital sexual intercourse with male and female adults, as well as his wife. See Resp. Ex. 1, at 5. During the time of his second marriage, Respondent admitted that he began to engage in more fantasies about exposing his penis to younger females. See Govt. Ex. 7, at 2.

10. Respondent reported having an estimated total of 100 consenting female sexual partners and 10 male sexual partners. See Govt. Ex. 3, at 4. He started having sex with men at age 17 and his last male sexual partner was at age 44. See id. Although Respondent characterized most of his sexual relationships with men as "one-night stands," he did acknowledge having more extended affairs with two male partners. See id. Respondent denies having sex with men while incarcerated. See id.

11. Respondent reported exposing himself to 300 different females on 1000 occasions. See Govt. Ex. 3, at 4; Govt. Ex. 16;

Govt. Ex. 19, at 34-35.  According to him, "[y]ounger girls are more accepting.  I exposed to pre-adolescent and adolescent girls – but not that many.  But I thought a lot about it."  Govt. Ex. 3, at 4-5.  Respondent admitted that he would expose himself to young females, possibly some of whom were underage, when he was drinking alcohol.  See Govt. Ex. 16.  According to Respondent, his desire to expose himself to women "took over [his] life."  Govt. Ex. 19, at 35.  Respondent estimated that roughly twenty percent of the time sexual relations would follow the exposure.  See Govt. Ex. 19, at 36-37.

### III. Respondent's Criminal and Sexual Offense History

12.  On April 29, 1975, at age 20,[3] Respondent was convicted of Trespassing and Obtaining Money by False Pretenses in Virginia Beach Circuit Court.  See Gov't Ex. 10, at 9.  He was sentenced to a twelve-month term of imprisonment on the Trespassing conviction and four-year term of imprisonment on the Obtaining Money by False Pretenses charge.  See id.  The four-year sentence was suspended, conditioned upon four years of supervised probation.  See id.

13.  On September 30, 1980, at age 25, Respondent pled guilty to Robbery in Arkansas state court and was sentenced to 10 years imprisonment.  See Gov't Ex. 10, at 10; Gov't Ex. 19, at

---

[3] Respondent was 19 years old at the time of his arrest on these charges.

38. Concerning the offense, Respondent testified that he was hitchhiking and, after a woman picked him up, he shot her four times and drove off with her car. See Gov't Ex. 19, at 38-39. According to Respondent, he "had reached that point where [he] just had no concern whatsoever for other peoples' feelings." Gov't Ex. 19, at 38. Of the incident, Respondent later reported to BOP personnel, "that had he not gotten caught, he might have become a serial killer." Govt. Ex. 5, at 14. Respondent was released on parole on December 1, 1983. See Gov't Ex. 10, at 10; Gov't Ex. 19, at 39.

14. On March 1, 1984, while on probation for the Arkansas conviction, Respondent was arrested and charged with Indecent Exposure in Virginia state court. See Gov't Ex. 10, at 10. Respondent pled guilty to this offense and, on April 9, 1984, he was sentenced to a 12-month term of imprisonment. See id. In connection with this offense, Respondent, who was 28 years old at the time, grabbed his 13-year-old stepsister on her buttocks while hugging her. See Gov't Ex. 19, at 10-12. In his deposition, Respondent testified that he was very drunk at the time of the offense and that "[i]t wasn't an accident, I did it on purpose." See id. Respondent further testified that his stepsister was drunk at the time. See id. at 13. Because of his conviction on the Indecent Exposure charge, Respondent's

7

parole was revoked in 1985.  See Govt. Ex. 10, at 10.  He was
released from prison in May 1986.  See Govt. Ex. 10, at 10.

15.  In August 1987, at age 32, Respondent pled guilty, in
the Circuit Court of the City of Virginia Beach, Virginia, of
Forcible Sodomy, Aggravated Sexual Battery, and Indecent
Liberties.  See Gov't Ex. 10, at 10; Gov't Ex. 18; Gov't Ex. 19,
at 15.  As a result of these convictions, on September 22, 1987,
Respondent was sentenced to a term of imprisonment of 14 years.
See Gov't Ex. 18; Gov't Ex. 10, at 10.  In connection with this
offense, Respondent molested the 8-year-old daughter of someone
he was dating over the course of two weekends.[4]  See Gov't Ex.
19, at 17.  Respondent exposed himself to the eight-year-old,
kissed her, and engaged in mutual oral sex.  See Gov't Ex. 19, at
18.  During his deposition, Respondent stated that he began
engaging in sexual contact with the eight-year-old victim within
a week of meeting her.  See Gov't Ex. 19, at 16.  Respondent was
attracted to the 8-year-old victim because of "her hair and her
intelligence."  Id.  According to his deposition testimony,
"[s]he just had extremely long, pretty hair[,]" and "[s]he was
smart.  She was - - the word they use these days, I guess, is
precocious, but she was just a smart person.  And it made it easy
to talk to her."  Id.  At the time of the offense, Respondent was

_____

[4] In 2008, Respondent told the BOP psychologist conducting
his pre-certification review that the abuse lasted for about a
three-week period.  See Govt. Ex. 7, at 3.

also sexually involved with the victim's mother. See id. King further testified that, at some point, he considered the possibility of a sexual encounter involving both the mother and daughter at the same time. See id. at 17. Respondent stated that he "was equally turned on by young girls as an older woman." Govt. Ex. 3, at 5. King was released on parole on May 9, 1994. See Gov't Ex. 10, at 10.

16. On December 20, 1994, King's parole was revoked because he failed to comply with court-ordered sex offender treatment. See Gov't Ex. 10, at 10; Gov't Ex. 19, at 23. Respondent reported that he was "kicked out" of the program for not getting along with his group. Gov't Ex. 19, at 22-23. He was released from prison on August 2, 1999. See Gov't Ex. 19, at 23.

17. Between December 1999 and January 2000, Respondent exposed himself on one or more occasions to the eleven-year-old daughter of a woman he was dating. See Govt. Ex. 19, at 24-27; Govt. Ex. 3, at 5-6. On one of these occasions, defendant was left alone for an extended period of time with the eleven-year-old, he began to disrobe and move towards the young girl while making undisclosed sexual remarks. See Govt. Ex. 10, at 11. Respondent admitted to having fantasies about a three-way sexual encounter between himself, the eleven-year-old girl, and her mother. See Govt. Ex. 19, at 31-32. At the time of this

offense, Respondent was having sex with the victim's mother as well as two other women.  <u>See</u> Govt. Ex. 3, at 5-6; Govt. Ex. 7.

18.  As a result of this behavior with the 11-year-old girl, on June 30, 2000, in the Circuit Court of Norfolk, Virginia, Respondent was arrested and charged with two counts of Indecent Liberties.  <u>See</u> Govt. Ex. 10, at 11.  After being convicted on one count of Indecent Liberties, on August 24, 2001, Respondent was sentenced a term of imprisonment of ten years, with five years suspended conditioned upon supervised probation and good behavior.  <u>See</u> Govt. Ex. 11.  Respondent was released from prison on January 10, 2005.  <u>See</u> Govt. Ex. 10 at 11

19.  On May 5, 2005, in the United States District Court for the District of South Carolina, Respondent pled guilty to Conspiracy to Commit Armed Bank Robbery, in violation of 18 U.S.C. § 371.  <u>See</u> Govt. Ex. 9, at 1; Govt. Ex. 10, at 1.  The offense of conviction concluded on February 3, 2005.  <u>See</u> Govt. Ex. 9, at 1.  Respondent was sentenced to a term of incarceration of 60 months.  <u>See</u> Govt. Ex. 9, at 2.  At the time this offense was committed, defendant was on probation for the Indecent Liberties conviction in Virginia Beach Circuit Court.  <u>See</u> Gov't Ex. 10, at 11.

20.  On January 20, 2006, Respondent's probation on the Indecent Liberties conviction was revoked and he was ordered to be incarcerated with the Virginia Department of Corrections for a

term of five years.  See Govt. Ex. 8; Resp. Ex. 3.  Respondent
was awarded credit for time served in confinement while awaiting
trial.  See id.  Respondent remains in federal custody and has
yet to begin service of his state sentence which is to run
consecutive to his federal sentence.  See Resp. Ex. 3.

**IV. Respondent's Mental Health and Substance Abuse History**

21.  Respondent reported that he began using alcohol at the
age of 15 and cannabis at the age of 16.  See Govt. Ex. 7, at 4.
He reported using these drugs regularly between 1971 and 1999.
See id.  Respondent also experimented with cocaine, amphetamines,
barbiturates, peyote, LSD, and hallucinogenic mushrooms.  See
Govt. Ex. 6, at 2.

22.  Respondent stated that he first saw a mental health
professional when he was 14 years old and recalls being diagnosed
with hyperactivity and symptoms of "pseudopsychopathy."  Govt.
Ex. 7, at 4.

23.  Respondent's next contact with a mental health
professional occurred in 1987 when, at the age of 23, he was
admitted to the hospital for 11 days after an overdose of jimson
seeds.  See Govt. Ex. 7, at 4.  Respondent denied being suicidal
at that time.  See id.

24.  Respondent reported completing a six-week program for
mental health and substance abuse issues in 1994.  See Govt. Ex.
7, at 4.

25.  According to BOP medical records, Respondent was referred to Dr. Thomas Owens, a psychiatrist, in January 2011. See Govt. Ex. 5, at 4, 9.  Dr.  Owens reported that Respondent "wished to be treated for symptoms of hyperactivity, including inattention, distractibility, difficulty completing tasks, excessive talking, fidgeting, shifts in conversation, unstable mood, and others."  Govt. Ex. 5, at 4.  Respondent also told Dr. Owens that he had a lifelong sexual preoccupation with an average of seven orgasms per week.  See id.  He also reported obsessive-compulsive symptoms of counting objects and finding patterns in random objects.  See id.  Respondent also reported that both his mother and sister suffer from Bipolar Disorder and that he had attempted suicide by overdose on three occasions, at ages 15, 24, and 53.  See id.  Dr. Owens diagnosed Respondent with "other and unspecified Bipolar Disorders" (Bipolar Type II).  See Govt. Ex. 5, at 4, 9.  Dr. Owens further opined that although Respondent might have features of attention-deficit-type disorders, his most prominent symptoms were of an atypical bipolar and obsessive-compulsive nature.  See id.  Dr. Owens originally prescribed Prozac for Respondent's condition but, after Respondent reported several side effects, he changed his medication to Zoloft.  See Govt. Ex. 5, at 4-5, 10.

26.  In completing Respondent's Pre-Certification Review, Dr. Marcus R. Forbes concluded that Respondent "has a clear

history of recurrent, intense sexual urges and behavior involving young girls over a period greater than six months." Govt. Ex. 7, at 5. Dr. Forbes went on to diagnose Respondent as suffering from Pedophilia, Sexually Attracted to Females, Nonexclusive Type; Exhibitionism; Alcohol Abuse, In a Controlled Environment; and Cannabis Abuse, In a Controlled Environment. See Govt Ex. 7, at 5. In assessing Respondent's risk of reoffending, Dr. Forbes concluded that he was at high risk of reoffending. See Govt. Ex. 7, at 5-6.

27. Psychosexual Testing Results, dated March 18, 2011, show that Respondent "recognizes he lacks control over his sexual behavior and needs treatment to control his sexual behavior. If he is to be involved in treatment, there are concerns about his amenability. For instance, he shows little contrition for his actions which suggests he may not have much incentive to change his behavior. His history indicates he has had a difficult time living within the expected limits of responsible behaviors which if it continues will diminish the likelihood he will be successful in also controlling his sexual behaviors." Govt. Ex. 17.

28. On April 15, 2011, a Bureau of Prisons' psychologist, Dr. Melanie B. Malterer, completed a psychological evaluation of Respondent in conjunction with his participation in the Commitment Treatment Program (CTP) at FCI-Butner. See Govt. 15.

Dr. Malterer opined that Respondent met the DSM-IV criteria for Alcohol Abuse, in a Controlled Environment, and Cannabis Abuse, in a Controlled Environment. See Govt. Ex. 15, at 10. According to Dr. Malterer, Respondent acknowledged having some current sexual interest in children. See Govt. Ex. 15, at 11. However, "he is adamant that this interest will not lead to future sexual offending behavior because he holds a different view of people now (e.g., feels more empathy and compassion toward others)." Id. Dr. Malterer referred to Respondent's assertions about his risk of reoffending as "superoptimism." Id.

29. Dr. Malterer further noted that Respondent openly reported a history of sexual arousal by thoughts and fantasies involving force, rape, bondage, and hurting and/or humiliating a sexual partner. See Govt. Ex. 15, at 11. Dr. Malterer also found that Respondent met the DSM-IV criteria for Pedophilia, Females, Non-Exclusive Type, Exhibitionism, and Antisocial Personality Disorder. See Govt. Ex. 15, at 13 and 18. Dr. Malterer provisionally diagnosed Respondent as suffering from ADHD, Obsessive-Compulsive Disorder, and Bipolar I Disorder. See Govt. Ex. 15, at 18.

30. Finally, with respect to Respondent's approach to sexually offending, Dr. Malterer concluded that Respondent was "Approach-Automatic." Govt. Ex. 15, at 19. According to Dr. Malterer,

14

The approach-automatic pathway is characterized by
approach goals with respect to sexually offending.
These individuals do not attempt to avoid reoffending.
Rather, in a relatively automatic manner, they
"approach" or work toward offending.  They experience
positive emotional states both in the phases preceding
and following the sexual offense.  Given the
individual's failure to effectively control their
behavior, this pathway reflects an under-regulated or
disinhibited pathway.  These individuals frequently
appear impulsive and engage in rudimentary and
unsophisticated planning. . . . He does not appear to
have engaged in strategies or behaviors to refrain from
sexually offending. . . . He has repeatedly
demonstrated a self-regulatory style that is impulsive
and poorly regulated.  When sexually offending, he has
acted impulsively and opportunistically with minimal
planning.  Following the offenses, he has minimized,
justified, or denied his behavior.

Govt. Ex. 15, at 19.

31.  As late as June 2011, Respondent reported that he

continued to have sexual fantasies about the eleven-year-old girl

to whom he exposed himself in December 1999/January 2000.

Respondent acknowledged masturbating to those fantasies but

contended that he had eliminated those fantasies himself.

**V.  Sex Offender Treatment**

32.  Respondent had weekly therapy sessions with Dr. Paul

Lightner while incarcerated from 1988 through 1994.  See Govt.

Ex. 3, at 6.  Although he was serving time for a sex offense, his

therapy was not sex offender specific.  See id.

33.  In 1994, while on parole, Respondent was assigned to

outpatient sex offender treatment.  See Govt. Ex. 3, at 6.

According to his own account, Respondent did not complete the

15

treatment program as he was kicked out after approximately six weeks.  See id. at 6-7.  His failure to complete treatment led to the revocation of his parole.  See id. at 7.

34.  On November 25, 2008, Respondent declined to participate in the BOP's Sex Offender Management Program (SOMP), a voluntary group treatment program, contending that he did not have time to do so.  See Resp. Ex. 9.

35.  In December 2010, Respondent agreed to participate in the Commitment Treatment Program (CTP) at FCI-Butner, a sex offender treatment program targeted at those certified and committed under the Adam Walsh Act.  See Govt. Ex. 3, at 7; Resp. Ex. 8; Resp. Ex. 10.  However, he did not complete the CTP, dropping out after five months in May 2011.  See Govt. Ex. 3, at 7; Govt. Ex. 13.

36.  In Psychosexual Testing Results dated March 18, 2011, Respondent "recognize[d] he lacks control over his sexual behavior and needs treatment to control his sexual behavior." Govt. Ex. 17.

**VI. Respondent's Institutional Conduct**

37.  Respondent has consistently received satisfactory to outstanding evaluations for his work assignments while incarcerated.  See Resp. Ex. 6.

38.  Respondent had incurred no formal sanctions for misbehavior while incarcerated in the BOP.  See Govt. Ex. 5, at

16

8. He did, however, receive several sanctions in mid-2011 during his civil detention. See id. All of these sanctions occurred when Respondent refused to leave the restricted housing cell in which he had been placed. See id.

## VII. Evaluation of Government's Expert Dr. Gary Zinik

39. Dr. Gary Zinik is a licensed psychologist, who has evaluated approximately fifteen sex offenders to determine whether they are sexually dangerous persons under the Adam Walsh Act. Testimony of Gary Zinik, September 13, 2013 ("Zinik Test.").

40. Dr. Zinik has testified as an expert in the forensic psychology of sex offenders in federal court as well as in several state courts regarding the dangerousness of sexual offenders. See Zinik Test.

41. Dr. Zinik's curriculum vitae is Government's Exhibit 1.

42. Dr. Zinik's written forensic evaluation of Respondent, dated July 8, 2011, is Government's Exhibit 2. His updated evaluation of Respondent, dated December 7, 2011, is Government's Exhibit 3. Dr. Zinik opined, both in his evaluation reports and during his testimony in the evidentiary hearing, that Respondent met the Act's criteria for civil commitment. See Govt. Ex. 2, at 22; Govt. Ex. 3, at 11; Zinik Test.

43. In forming his opinion that Respondent met the Act's criteria for civil commitment, Dr. Zinik considered the documents

referenced in his report as well as additional information related to Respondent's criminal, medical, social, and substance abuse histories. <u>See</u> Govt. Ex. 2, at 1-2; Zinik Test. Dr. Zinik did not interview Respondent in preparing his first report. <u>See</u> Govt. Ex. 2, at 1. However, Dr. Zinik did have the opportunity to interview Respondent in preparing his updated evaluation. <u>See</u> Govt. Ex. 3, at 1.

44. Dr. Zinik determined that Respondent had previously engaged in or attempted to engage in child molestation. <u>See</u> Govt. Ex. 2, at 2; Zinik Test.

45. Dr. Zinik diagnosed Respondent with Pedophilia, Sexually Attracted to Females, Non-exclusive Type.[5] <u>See</u> Govt. Ex. 2, at 12; Zinik Test. The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR") requires that the following criteria be met to support a diagnosis of pedophilia: (1) over a period of at least six months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children; (2) the person has acted on these sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty; and (3) the person is at least age 16 years and at least 5 years older than

---

[5] The specifier "Non-exclusive Type" indicates that Respondent also has sexual attraction and behaviors involving adults. <u>See</u> Govt. Ex. 5, at 8.

the child or children.  Govt. Ex. 2, at 13; Zinik Test.

46.  In coming to his diagnosis of Pedophilia, Dr. Zinik found significant the fact that Respondent admitted to having masturbation fantasies about the 11-year-old victim from his 1999-2000 offense until June 2011.  Zinik Test.  According to Dr. Zinik, "it's ongoing evidence of his pedophilia and his sexual arousal of children."  Zinik Test.

47.  Dr. Zinik also diagnosed Respondent with Exhibitionism. See Govt. Ex. 2, at 12; Zinik Test.  According to Dr. Zinik, "[e]xhibitionism involves the unwanted exposure of one's genitals, usually to a stranger."  Govt. Ex. 2, at 13.  Dr. Zinik stated that exhibitionism is very compulsive and has the highest recidivism rate of all sex offenses.  See id.

48.  Dr. Zinik further opined that Respondent suffered from Alcohol Abuse, in remission in a controlled environment and Cannabis Abuse, in remission in a controlled environment.  See Govt. Ex. 2, at 12; Zinik Test.

49.  Finally, Dr. Zinik concluded that Respondent suffered from an Antisocial Personality Disorder.  See Govt. Ex. 2, at 12; Zinik Test.  The DSM-IV-TR defines Antisocial Personality Disorder as follows:  "A pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood."  Govt. Ex. 2, at 13.  According to Dr. Zinik, Respondent had evidence of the

19

disorder in childhood and currently meets the following adult

criteria for Antisocial Personality Disorder:

> (1) Failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest. (2) Deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure. (3) Impulsivity or failure to plan ahead. (4) Irritability and aggressiveness, as indicated by repeated physical fights or assaults. (5) Consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations.

Govt. Ex. 2, at 13-14.

50. To determine whether Respondent would have serious

difficulty refraining from sexually violent conduct or child

molestation, Dr. Zinik used several risk assessment tools,

including those that examine both static and dynamic risk factors

for re-offense. See Govt. Ex. 2, at 15-29; Zinik Test.

51. Dr. Zinik used three actuarial scales aimed mainly at

examining static risk factors for sex offender risk assessment.

See Govt. Ex. 2, at 17. Dr. Zinik used the Static-99R and the

Static-2002R, both of which had been recently updated to account

for the relationship between age and sexual recidivism. See id.

As to the Static-99R, Dr. Zinik testified that "it's really the

most widely used actuarial scale in sex offender risk assessment

across the country and even internationally. It's what you might

call the gold standard for sex offender risk assessment. It's

been cross-validated numerous times. It's also nicely adjusted

for controlling for age." Zinik Test. Regarding his use of the

Static-2002R, Dr. Zinik testified that there was "good research to support that it's useful in risk assessment of sex offender" and that it was "becoming more widely used." Zinik Test.

52. The final scale he used was the Minnesota Sex Offender Screening Tool—Revised (MnSOST–R)[6], which is a risk assessment actuarial that examines re-arrests for new contact sexual offenses over a six-year period after release. See Govt. Ex. 2, at 17.

53. Dr. Zinik stated that "all three static risk scales are supported by empirical research to have moderate predictive accuracy and are frequently utilized for evaluating sex offenders." Govt. Ex. 2, at 17.

54. Dr. Zinik further testified that each of those risk assessment actuarials placed Respondent in high-risk categories for re-offending. See Govt. Ex. 2, at 19. Under Dr. Zinik's administration of the tests, Respondent scored a 7 on the Static-99R, which associates with a 37.9% risk of recidivism in five years and 48.6% risk of recidivism in ten years. See Govt. Ex. 2, at 19. On the Static-2002R, Respondent "received a score of 9 placing him in the High Risk Category and corresponding to a 41.6% estimated risk of sexual recidivism in 5 years and a 52.3% risk of recidivism in 10 years." Id. With a score of 17,

_____

[6] Dr. Zinik testified that he no longer uses the MnSOST-R because an updated version has been released and he has not been trained on the new version. See Zinik Test.

Respondent placed in the "Refer for Civil Commitment Evaluation" risk range on the MnSOST—R, which associates with a forty percent recidivism rate within six years following release for offenders under supervision. Id. at 19-20. For offenders who are not supervised in the community, he has a 72 percent probability of rearrest for a sexual offense in six years. See id.

55. In addition to assessing Respondent's static risk factors for future sexual offending, Dr. Zinik examined Respondent's "dynamic risk factors" or "need factors" because they reflect the needs of the offender that should be targeted for treatment and supervision to reduce risk." Govt. Ex. 2, at 15.

56. To assess Respondent's dynamic risk factors, Dr. Zinik used the Structured Risk Assessment—Forensic Version Light(SRA—FV Light)[7] to examine three different areas: (1) sexual interests, (2) relationship style, and (3) self-management. See Govt. Ex. 2, at 15-16.

57. According to Dr. Zinik, Respondent's SRA-FV Light results indicate that, as to Respondent, "exceptional levels of risk management are warranted. The offender should be

_____

[7] The Structured Risk Assessment—Forensic Version (SRA-FV) includes scoring from the Psychopathy Checklist (PCL-R). See Govt. Ex. 2, at 16. When the Psychopathy Checklist cannot be scored -- as in this case because the Respondent cannot be interviewed -- a modified version of the SRA-VA, the SRA-FV Light is used. See id.

prioritized for more intensive and longer-term treatment interventions which would be required to effectively target this level of identified long-term vulnerabilities." Govt. Ex. 2, at 16-17.

58. In connection with Dr. Zinik's updated evaluation wherein he had the opportunity to interview Respondent, the SRA-FV was used to assess Respondent's dynamic/psychological risk factors. See Govt. Ex. 3, at 8-9. Dr. Zinik identified a list of dynamic risk factors present in Respondent's case that are associated with sexual reoffense:

a. Sexual preoccupation;[8]

b. Sexual preference for pre-pubescent or pubescent children;

c. Multiple paraphilias;

d. Lack of emotionally intimate relationships with adults;

e. Lifestyle impulsiveness;

f. Poor problem solving; and

g. Poor cooperation with rules and supervision.

_____

[8] "This refers to an abnormally intense interest in sex that dominates psychological functioning. Sexual preoccupation involves recurrent sexual thoughts and behaviors that are not directed toward a current romantic partner and may represent problems such as sexual compulsions, sexual addiction, and hypersexuality. This includes masturbation habits, pornography, use of prostitutes, sex-oriented internet use, sexual promiscuity, etc." Govt. Ex. 3, at 9.

Govt. Ex. 3, at 8-10.

59. Dr. Zinik opined that because "many sexual offenses go undetected, unreported and/or uncharged[,] . . . all [risk assessment] scales underestimate the probability that an offender will commit a new undetected/uncharged sexual offense during the remainder of his lifetime." Govt. Ex. 3, at 8; Govt. Ex. 2, at 22. Respondent's expert, Dr. Plaud, agreed with Dr. Zinik's opinion in this regard. See Plaud Test.

60. Upon administration of the Hare Psychopathy Checklist-Revised (PCL-R), Respondent received a score of 26 that, according to Dr. Zinik, "suggests that he presents a high risk to commit future antisocial and violent criminal behavior." Govt. Ex. 3, at 10.

61. According to Dr. Zinik, Respondent's failure to successfully complete sex offender treatment is significant because "[s]tudies show that offenders who are either kicked out of or drop out of sex offender treatment have higher recidivism rates than other offenders who complete treatment or never attempt treatment." Govt. Ex. 3, at 7; Zinik Test.

62. As part of the basis for his opinion that Respondent would have serious difficulty in refraining from sexually violent conduct or child molestation if released, Dr. Zinik mentioned Respondent's repeated failures while on supervision. See Zinik Test. According to Dr. Zinik, "poor cooperation in supervision

24

is also an empirically supported dynamic risk factor that increases sex offender reoffense." Zinik Test.

63. Dr. Zinik also found significant that Respondent had proven unable to live in the community for any significant period of time without committing a new offense. *See* Govt. Ex. 3, at 10. Dr. Zinik also noted that Respondent "reoffends rapidly, sometimes only months after release from custody." Govt. Ex. 2, at 22.

64. Dr. Zinik did not believe that the medications Respondent had been taking rendered him non-dangerous within the meaning of the Act. *See* Zinik Test. This was especially true given that, at various times, Respondent had been noncompliant with taking those medications. *See* Zinik Test.

65. Dr. Zinik stated that, although he considered Respondent's advancing age in arriving at his conclusions, he did not feel that age overrode the other compelling factors indicating that Respondent would have serious difficulty in refraining from sexually violent conduct or child molestation if released. *See* Zinik Test.

66. Based on the foregoing, Dr. Zinik opined that Respondent satisfies the Act's "serious difficulty refraining" prong because Respondent poses such a high risk for sexual re-offense. *See* Govt. Ex. 2, at 22.

**VIII. Evaluation of Government's Expert Dr. M. Lela Demby**

25

67. Dr. M. Lela Demby is a sex offender forensic psychologist, employed by the United States Public Health Service and stationed at FCI Butner. See Govt. Ex. 4; Testimony of M. Lela Demby, September 13, 2013 ("Demby Test."). At the time of the hearing, Dr. Demby had conducted over 1,060 evaluations under the Adam Walsh Act. See Demby Test.

68. Dr. Demby's curriculum vitae is Government's Exhibit 4.

69. Dr. Demby's pre-certification forensic evaluation[9] of Respondent, dated May 12, 2009, is Government's Exhibit 6. Her updated forensic evaluation, dated July 28, 2011, is Government's Exhibit 5.

70. Dr. Demby opined, both in her updated forensic evaluation and during her testimony in the evidentiary hearing, that Respondent met the Act's criteria for civil commitment. Govt. Ex. 5, at 25; Demby Test.

71. In forming her opinion that Respondent met the Act's criteria for civil commitment, Dr. Demby examined substantially the same material that Dr. Zinik examined. See Govt. Ex. 5, at 1-2. However, unlike Dr. Zinik, Dr. Demby did not interview Respondent because he declined to be interviewed. See Demby Test; Govt. Ex. 5, at 1.

---

[9] Dr. Demby's original evaluation was to determine if Respondent should be certified as a Sexually Dangerous Person under the Adam Walsh Act. See Govt. Ex. 6, at 1.

72.  Dr. Demby diagnosed Respondent with Pedophilia, sexually attracted to female, non-exclusive type, Exhibitionism, Obsessive-Compulsive Disorder (Provisional), Bipolar II Disorder (Provisional), Antisocial Personality Disorder, Alcohol Abuse, and Cannabis Abuse.  See Govt. Ex. 5, at 16; Govt. Ex. 6, at 7; Demby Test.  In her testimony and written reports, Dr. Demby explained the bases for each of her diagnoses and opined that each qualify as "serious mental illnesses, abnormalities, or disorders" under the Act.  See Demby Test; Govt. Ex. 5; Govt. Ex. 6.  Dr. Demby also stated that Paraphilia, such as pedophilia and exhibitionism, "tend to be chronic and lifelong, but both the fantasies and the behaviors often diminish with advancing age in adults.  The behaviors may increase in response to psychosocial stressors, in relation to other mental disorders, or with increased opportunity to engage in the Paraphilia."  Govt. Ex. 5, at 16.

73.  To determine whether Respondent would have serious difficulty refraining from sexually violent conduct or child molestation, Dr. Demby used several risk assessment tools, including those that examine both static and dynamic risk factors for sexual re-offense.  See Demby Test; Govt. Ex. 5, at 19-25; Govt. Ex. 6, at 9-11.

74.  Over the course of her two evaluations, the risk assessment testing that Dr. Demby used to evaluate Respondent's

27

risk of re-offense include the Static—99, the Static—99R, the Rapid Risk Assessment for Sex Offense Recidivism (RRASOR), the Minnesota Sex Offender Screening Tool—Revised (MnSOST—R),and the Hare Psychopathy Checklist- Revised (PCL-R). See Govt. Ex. 5, at 19-21.

75.  The RRASOR is a risk assessment actuarial that "assesses the probability of sexual recidivism in adult male sexual offenders." Govt. Ex. 5, at 19.

76.  According to Dr. Demby's first forensic evaluation, Respondent scored an eight on the STATIC-99, a four on the RRASOR, and a seven on the MnSOST—R.  See Govt. Ex. 6, at 9-10. According to Dr. Demby, these actuarial scores indicate a moderate to high risk of sexual reoffense.  See Govt. Ex. 6, at 12.

77.  For her updated evaluation of Respondent, Dr. Demby administered the Static-99R.  See Govt. Ex. 5, at 20-21. Respondent scored a seven on the Static-99R (due to the one-point reduction for age that, unlike the Static-99, the STATIC-99R contemplates), putting him in the High Risk Category.  See Govt. Ex. 5, at 20-21; Demby Test.  According to Dr. Demby, the Static-99 has approximately 40 years of research behind it and is widely accepted.  According to her, the Static-99R has built on that 40 years of research.  See Demby Test.  Dr. Demby further testified

28

that she had concerns about using the MATS-1 because of its relative newness.  <u>See</u> Demby Test.

78.  Dr. Demby also used the Sexual Violence Risk-20 (SVR—20) and the PCL—R to evaluate dynamic risk factors for sexual re-offense.  <u>See</u> Govt. Ex. 5, at 22; Govt. Ex. 6, at 10. According to Dr. Demby, the SVR-20 "is an assessment procedure developed primarily for use in sexual violence risk assessments conducted in criminal and civil forensic contexts."  Govt. Ex. 5, at 22.  Respondent placed in a high-risk category on the SVR—20 as administered by Dr. Demby.  <u>See</u> Govt. Ex. 5, at 24.  As to the PCL-R, Dr. Demby found that Respondent placed in the High range (given the standard error of measurement).  <u>See</u> Govt. Ex. 6, at 10.

79.  As part of the basis for her opinion, Dr. Demby considered Respondent's reoffense while on supervision because it is a risk factor.  <u>See</u> Govt. Ex. 6, at 11; Govt. Ex. 5, at 23; Demby Test.  According to Dr. Demby, "[h]e has repeatedly ignored the typical external controls that impede an offender's drive towards sexual reoffending, and reoffense while on supervision is considered an exacerbating factor."  Govt. Ex. 6, at 11.

80.  According to Dr. Demby, Respondent's failure to successfully complete sex offender treatment is significant in assessing his current risk of reoffending and is considered to be an exacerbating factor.  <u>See</u> Govt. Ex. 5, at 24; Demby Test.  Dr.

Demby opined that Respondent's treatment failures have left him without the ability to better manage himself in the community and, therefore, make it more likely that he will have serious difficulty refraining from sexually violent conduct or child molestation. See Demby Test.

81. Dr. Demby stated that, although she considered Respondent's advancing age in arriving at her conclusions, she did not feel that age overrode the other compelling factors indicating that Respondent would have serious difficulty in refraining from sexually violent conduct or child molestation if released. See Demby Test. According to Dr. Demby, Respondent's age had been accounted for in the Static-99R. See Govt. Ex. 5, at 24-25. Dr. Demby further opined that, even if Respondent were 63 years of age, if all other factors remained the same, he would still be sexually dangerous under the Act. See Demby Test.

82. Based on the foregoing, Dr. Demby opined that Respondent satisfies the Act's "serious difficulty refraining" prong because Respondent poses such a high risk for sexual re-offense. Govt. Ex. 5, at 25; Demby Test.

**IX. Evaluation of Respondent's Expert Dr. Joseph J. Plaud**

83. Dr. Joseph J. Plaud is a licensed psychologist and is board certified in behavioral analysis. Testimony of Joseph J. Plaud, September 13, 2013 ("Plaud Test.").

84. Dr. Plaud has testified as an expert in behavioral analysis on multiple occasions, both in state and federal court. See Testimony of Joseph J. Plaud, September 13, 2012 ("Plaud Test."); Resp. Ex. 1.

85. Dr. Plaud's curriculum vitae is Respondent's Exhibit 2.

86. Dr. Plaud's evaluation, based both on a review of documentation and an interview of Respondent, is Respondent's Exhibit 1.

87. Dr. Plaud opined, both in his written evaluation and during his testimony, that Respondent did not meet all of the Act's criteria for civil commitment. See Resp. Ex. 1, at 1; Plaud Test.

88. Dr. Plaud agreed with Dr. Zinik and Dr. Demby that Respondent had previously engaged in child molestation. See Resp. Ex. 1, at 1.

89. Dr. Plaud opined that Respondent did not suffer from a sexual disorder. See Plaud Test. According to Dr. Plaud, Respondent suffers from a bipolar-based disorder. See id. Dr. Plaud also testified that Respondent might suffer from an anxiety disorder and an obsessive compulsive disorder. See id. Dr. Plaud acknowledged that Respondent's bipolar disorder was a "serious mental illness or disorder in the general psychiatric sense, but that's not what prong two is about, the general psychiatric sense." Id.

90. According to Dr. Plaud, "all roads lead to the mood disorder." Plaud Test. Dr. Plaud testified that the mood disorder was at the root of Respondent's criminal behavior. See id. Acknowledging that Respondent had engaged in pedophilic behavior, Dr. Plaud opined that his doing so was because of his bipolar disorder and not because he was a pedophile. See id. Dr. Plaud opined that Respondent's bipolar disorder caused him to engage in risky behavior, like child molestation. See id.

91. Dr. Plaud did not agree with the assessment of Drs. Zinik and Demby that Respondent suffered from pedophilia. See Plaud Test., Resp. Ex. 1. According to Dr. Plaud, pedophilia "refers to intense and recurrent sexually arousing fantasies, urges or behaviors with prepubescent age children." Plaud Test. He further stated that "a diagnosis of pedophilia doesn't require behavior. It requires only that you have intense and recurrent sexually arousing fantasies or urges in addition. So you don't have to ever act on it to be validly diagnosed." Id. Dr. Plaud discounted the fact that Respondent admitting to having recurring sexual fantasies about his 11-year-old victim from 1999-2000, as late as June 2011, contending that the nature of sexual offender treatment was to "engage in thinking about the victims that they had in their past." Plaud Test.

92. Regarding the eight-year-old victim of Respondent's 1987 convictions, Dr. Plaud testified that Respondent displayed

"a lack of judgment" and that he was not motivated to specifically assault an 8-year-old girl because of an underlying condition.  Plaud Test.  Dr. Plaud opined that the victim was "in the wrong place at the wrong time."  <u>Id.</u>

93.  Dr. Plaud thought it "more probable" that Respondent might suffer from exhibitionism than pedophilia.  Plaud Test. Dr. Plaud testified, however, that even if Respondent did suffer from exhibitionism it was not a "serious mental illness, abnormality, or disorder" within the meaning of the Adam Walsh Act.  <u>See</u> Plaud Test.

94.  Dr. Plaud wrote in his evaluation that Respondent's "present psychological status does not allow for the professional conclusion that in October, 2011 he would have serious difficulty in refraining from sexually violent conduct or child molestation if he were released from a secure facility."  Resp. Ex. 1, at

95.  Dr. Plaud dismissed, either completely or in part, each of the risk assessment actuarials used by Dr. Zinik and Dr. Demby.  <u>See</u> Plaud Test.

96.  Dr. Plaud also dismissed the other psychological tools used by Dr. Zinik and Dr. Demby to evaluate Respondent.  <u>See</u> Plaud Test. (stating that the PCL—R does not predict sexual recidivism and that the SVR-20 was never designed for civil commitment).

97. Dr. Plaud used one risk assessment actuarial when he evaluated Respondent—the Multisample Age-Stratified Table of Sexual Recidivism Rates (MATS-1). See Resp. Ex. 1, at 10; Plaud Test. According to Dr. Plaud's report, the MATS-1 uses six items from the Static-99R and has a "larger and more representative sample of sex offenders released from incarceration than any other actuarial tool at present." Resp. Ex. 1, at 10.

98. On Dr. Plaud's administration of the MATS-1, Respondent scored in the "High" risk category, though Dr. Plaud noted that Respondent's "current age and score range is in an area [where] over three quarters of the sexual offenders do not" sexually reoffend. Id. at 12.

**X. Analysis of Respondent's Sexual Dangerousness**

**A. Respondent has engaged in or attempted to engage in sexually violent conduct or child molestation**

99. Bureau of Prisons regulations governing civil commitment standards for sexually dangerous persons define "child molestation" as "any unlawful conduct of a sexual nature with, or sexual exploitation of, a person under the age of 18 years." 28 C.F.R. § 549.93; United States v. Comstock, 627 F.3d 513, 520 (4th Cir. 2010).

100. Respondent's criminal history, as offered into evidence by the government, reveals multiple convictions, arrests, and admissions of child molestation as defined by Bureau of Prisons regulations. Respondent has stipulated that he has committed

34

acts of child molestation in the past.

101. Accordingly, the government has established by clear and convincing evidence that Respondent has engaged in or attempted to engage in acts of child molestation and the court so finds.

**B.    Respondent currently suffers from a serious mental illness, abnormality, or disorder.**

102. A mental illness, abnormality, or disorder "need not necessarily be one so identified in the DSM in order to meet" the civil commitment requirements embodied by 18 U.S.C. § 4247(a)(6). United States v. Carta, 592 F.3d 34, 40 (1st Cir. 2010). The Act does not even require the medical community's consensus as to what constitutes a "serious mental illness, abnormality, or disorder." Id.

103. The court finds that plaintiff suffers from the following serious mental illnesses, abnormalities, or disorders: pedophilia, exhibitionism, bipolar disorder, antisocial personality disorder, alcohol dependence, and cannabis dependence.

104. The court concludes that pedophilia, exhibitionism, bipolar disorder, and antisocial personality disorder satisfy the Act's standard for what qualifies as a "serious mental illness, abnormality, or disorder." The court so concludes based both on the DSM-IV-TR's description of the illnesses as well as the

35

illnesses' impact on Respondent's life as evidenced by the record.

105. The court finds the testimony and written evaluations of Drs. Zinik and Demby more persuasive on the issue of whether Respondent's suffers from pedophilia.  Dr. Plaud has not provided a persuasive justification as to why Respondent does not satisfy the relevant diagnostic criteria.

106. The court discounts Dr. Plaud's testimony and written evaluation insofar as he contends that Respondent does not suffer from pedophilia.  First, the court disagrees with Dr. Plaud's attempt to explain away Respondent's sexual fantasies about children as a byproduct of sex offender treatment.  Respondent himself testified that he continued to have sexual fantasies about "past events" with children until 2007.  Govt. Ex. 19, at 47-48.  From 2007 until mid-2011, by Respondent's own admission, he still continued to fantasize about his 11-year-old victim. See id. at 47-49.   Respondent also acknowledged masturbating to these fantasies up until June 2011.  See id. at 50.  The record is clear that Respondent was not in sex offender treatment for the vast majority of the time in which he admitted having these fantasies.  Therefore, these sexual fantasies about prepubescent children, which Dr. Plaud himself acknowledged would be evidence

of pedophilia, cannot be attributed to participation in treatment. See United States v. Wooden, 693 F.3d 440, 458 (4th Cir. 2012) ("[P]edophilia is characterized not only by child-centered sexual behavior, but also by child-centered sexual fantasies and urges.") (emphasis in original).

107. Second, regarding Dr. Plaud's opinion that the 8-year-old victim from 1987 was in the wrong place at the wrong time and that Respondent wasn't particularly motivated to engage in sexual contact with her specifically, the record suggests otherwise. Respondent testified that his sexual contact with the 8-year-old was not confined to one occasion but that, rather, it occurred over the course of two weekends. See Govt. Ex. 19, at 17. Respondent further testified that he was attracted to the 8-year-old after having only known her a week. See id. at 16. According to Respondent the 8-year-old was "smart" and "easy to talk to" and he "liked her." Id. at 16, 18. Respondent stated that "[i]t was easy to convince her that it was an okay thing to do. . . . She trusted me." Id. at 18. Respondent's own testimony undermines Dr. Plaud's opinion that he wasn't specifically attracted to the 8-year-old and that she was just a victim of circumstance.[10]

---

[10] Respondent's sexual interest in female adults is accounted for by application of the "non-exclusive type" specifier, which describes those individuals with pedophilia who "are sometimes attracted to adults." United States v. Johnson, 856 F. Supp.2d 768, 770 (E.D.N.C. 2012) (quoting DSM-IV-TR at

37

108. Furthermore, Dr. Plaud's opinion that Respondent is not motivated by a sexual interest in prepubescent children is not borne out by the record. At the time of both his 1987 offense and his 2000 offense, Respondent had one or more adult sexual partners available to him yet he still offended against minor children.

109. Accordingly, since the court has found by clear and convincing evidence that Respondent suffers from both pedophilia, exhibitionism, bipolar disorder, and antisocial personality disorder, the government has satisfied its burden on this element as well.

### C. If released, Respondent would have serious difficulty refraining from sexually violent conduct or child molestation as a result of his serious mental illnesses.

110. When analyzing the "serious difficulty refraining" prong in § 4248 civil commitment cases, a court must bear in mind the constitutional constraints on the civil commitment scheme. In Kansas v. Crane, 534 U.S. 407 (2002), the Supreme Court held that in order to civilly commit someone for sexual dangerousness, "there must be proof of serious difficulty in controlling [one's own] behavior." Id. at 413. The government need not show an absolute lack of control but there must be some lack-of-control determination. See id. at 411.

---

571).

111. In <u>Crane</u>, the Court reasoned that a lack-of-control determination is necessary to distinguish a "dangerous sexual offender subject to civil commitment 'from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings.'" <u>Id.</u> at 412 (quoting <u>Kansas v. Hendricks</u>, 521 U.S. 346, 360 (1997)). Otherwise, the Court added, civil commitment would assume the prosecutorial functions of criminal law. <u>See id.</u>

112. Regarding the Adam Walsh Act's specific civil commitment provisions, the "serious difficulty refraining" has several facets. First, when an inmate suffers from pedophilia, "the nature of [the inmate's] prior crimes provides a critical part of the answer" to the issue of whether that person will have serious difficulty refraining from sexually violent conduct or child molestation if released. <u>United States v. Wooden</u>, 693 F.3d 440, 458 (4th Cir. 2012).

113. The "serious difficulty refraining" prong does not require the fact-finder to determine "exactly how likely [the inmate] is to reoffend." <u>Id.</u> at 37 (quoting <u>United States v. Hunt</u>, 643 F. Supp. 2d 161, 180 (D. Mass. 2009)).[11]

---

[11] In <u>Crane</u>, the Supreme Court expressed this sentiment by stating, "in cases where lack of control is at issue, inability to control behavior will not be demonstrable with mathematical precision." <u>Crane</u>, 534 U.S. at 413 (internal quotations omitted).

114. However, recidivism rates are circumstantially relevant "because offenders who continually expose themselves to punishment may be presumed to have the most difficulty refraining from sexual reoffending." <u>Id.</u>

115. In the majority of the risk assessment actuarials used to evaluate Respondent's risk of sexually re-offending, including the one that Respondent's own expert witness used, Respondent placed in the highest risk categories. The percentages associated with those categories vary across the actuarial used. Because recidivism rates are circumstantially relevant, however, it is fair to use the actuarials' consensus as an indicator that Respondent would likely sexually reoffend if released. In other words, Respondent "may be presumed to have the most difficulty refraining from sexual reoffending." <u>Wooden</u>, 693 F.3d at 461. Accordingly, the circumstantial value that the actuarials provide weigh in favor of concluding that Respondent would have serious difficulty refraining from child molestation if released.

116. The court finds Dr. Zinik and Dr. Demby's testimony and written evaluations regarding Respondent's performance on several risk assessment tools more persuasive.

117. The court further finds that Respondent's persistent history of molesting and exposing himself to young children, his continuing sexual fantasies about an 11-year-old child, his failure to complete sex offender treatment, his repeated failures

40

on supervision, and his lack of a meaningful release plan or relapse prevention plan show that he would have serious difficulty refraining from child molestation if released from custody. The court has considered Respondent's age, as well as the undischarged term of state imprisonment, but finds that they do not sufficiently mitigate the other indicators of risk discussed above.

118. Accordingly, the court finds, by clear and convincing evidence, that as a result of Respondent's pedophilia, exhibitionism, bipolar disorder, and antisocial personality disorder –  either acting alone or in combination with each other and/or his alcohol and cannabis dependence – he will have serious difficulty refraining from sexually violent conduct or child molestation as a result of his serious mental illnesses if released.

## CONCLUSIONS OF LAW

1.  Clear and convincing evidence establishes that Respondent has engaged and attempted to engage in child molestation within the meaning of 18 U.S.C. § 4247(a)(5).

2.  Clear and convincing evidence establishes that Respondent currently suffers from serious mental illnesses, abnormalities, or disorders within the meaning of 18 U.S.C. § 4247(a)(6)—namely, pedophilia, exhibitionism, bipolar disorder,

antisocial personality disorder, alcohol dependence, and cannabis dependence.

3.    Clear and convincing evidence establishes that as a result of such serious mental illnesses, abnormalities, or disorders Respondent would have serious difficulty in refraining from child molestation if released within the meaning of 18 U.S.C. § 4247(a)(6).

4.    Therefore, clear and convincing evidence establishes that Respondent is a sexually dangerous person within the meaning of 18 U .S.C. §§ 4247(a)(5) and 4248(d), and that he thereby meets the criteria for civil commitment under 18 U.S.C. § 4248(d).

The Clerk is directed to send a copy of these Findings of Fact and Conclusions of Law to counsel of record.

**IT IS SO ORDERED** this 17th day of April, 2013.

ENTER:

David A. Faber
Senior United States District Judge

42