**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

**NO. 5:09-HC-2076-FA**

UNITED STATES OF AMERICA,

       Petitioner,

v.                                <u>MEMORANDUM OPINION AND ORDER</u>

JOHN BLANFORD KING,

       Respondent.

     This matter is before the court to review the commitment of respondent, John Blanford King, as a sexually dangerous person pursuant to the Adam Walsh Child Protection and Safety Act of 2006, 18 U.S.C. § 4248. For the reasons that follow, the Court finds that King is no longer sexually dangerous and orders his unconditional release from federal commitment.

<u>Background</u>

     On May 5, 2005, in the United States District Court for the District of South Carolina, John Blanford King ("King" or "Respondent") pled guilty to Conspiracy to Commit Armed Bank Robbery, in violation of 18 U.S.C. § 371. <u>See</u> Govt. Ex. 3 at 10. The offense of conviction concluded on February 3, 2005. <u>See id.</u> King was sentenced to a term of incarceration of 60 months. <u>See id.</u>

     On June 8, 2009, prior to his release from federal custody, a Certificate of Sexually Dangerous Person was filed against King

in the United States District Court for the Eastern District of North Carolina.  See Gov't Ex. 1.  The Bureau of Prisons certified Respondent King as a sexually dangerous person under the Adam Walsh Act.  See id.[1]

The Act establishes a program for the civil commitment of individuals in the custody of the Federal Bureau of Prisons ("BOP"), and others, who are determined to be "sexually dangerous person[s]."  18 U.S.C. § 4248(d).  The commitment process is initiated when either the Attorney General, the Director of BOP, or their designee files a certification that an individual is sexually dangerous pursuant to the Act.  See 18 U.S.C. § 4248(a); United States v. Timms, 664 F.3d 436, 439 (4th Cir. 2012).  Following certification, the district court must conduct a hearing to determine if the person is sexually dangerous.  See 18 U.S.C. § 4248(a).  "If, after the hearing, the court finds by clear and convincing evidence that the person is a sexually dangerous person, the court shall commit the person to the custody of the Attorney General."  18 U.S.C. § 4248(d).

To commit an individual, 18 U.S.C. § 4248 requires the government to prove by clear and convincing evidence that the

---

[1] "Congress enacted the Adam Walsh Child Protection and Safety Act of 2006 to 'protect children from sexual exploitation and violent crime, to prevent child abuse and child pornography, to promote internet safety, and to honor the memory of Adam Walsh and other child crime victims.'"  United States v. Searcy, 880 F.3d 116, 119 (4th Cir. 2018) (quoting Pub. L. No. 109-248, 120 Stat. 587).

individual is a "sexually dangerous person."  Under the Act, a "sexually dangerous person" is one who "has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others."  18 U.S.C.A. § 4247(a)(5). The phrase "sexually dangerous to others" means that "the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released."  18 U.S.C. § 4247(a)(6).  Thus, to satisfy the criteria for civil commitment under § 4248, the government must show by clear and convincing evidence that an individual: (1) has previously "engaged or attempted to engage in sexually violent conduct or child molestation"; (2) currently "suffers from a serious mental illness, abnormality, or disorder"; and (3) "as a result of" such condition, "would have serious difficulty in refraining from sexually violent conduct or child molestation if released."  18 U.S.C. § 4247(a)(5), (6); see United States v. Comstock, 560 U.S. 126, 130 (2010).

By Judgment Order entered March 29, 2013, the court ordered King committed to the custody of the United States Attorney General as a sexually dangerous person pursuant to 18 U.S.C. § 4248(d).  See Gov't Ex. 2.  In so doing, the court found that clear and convincing evidence established that (1) King had engaged and attempted to engage in child molestation within the

3

meaning of 18 U.S.C. § 4247(a)(5); (2) at the time of the order of commitment, King suffered from serious mental illnesses, abnormalities, or disorders within the meaning of 18 U.S.C. § 4247(a)(6)—namely, pedophilia, exhibitionism, bipolar disorder, antisocial personality disorder, alcohol dependence, and cannabis dependence; and (3) as a result of such serious mental illnesses, abnormalities, or disorders, King would have serious difficulty in refraining from child molestation if released within the meaning of 18 U.S.C. § 4247(a)(6). See Gov't Ex. 3 at 41-42.

At the time the Bank Robbery offense was committed, King was on probation for an Indecent Liberties conviction in Virginia Beach Circuit Court. See id. at 10. On January 20, 2006, King's probation on the Indecent Liberties conviction was revoked and he was ordered to be incarcerated with the Virginia Department of Corrections for a term of five years. See id. at 10-11; see also Resp. Ex. 3. Therefore, once King is released from civil commitment, he will begin service of his state sentence which is to run consecutive to his federal sentence. See id.; see also Resp. Ex. 3.

> Once a person has been civilly committed, the Act provides procedures for reevaluation and possible release. The director of the facility where a person is civilly committed must prepare annual reports "concerning the mental condition of the person and containing recommendations concerning the need for continued commitment" and submit those reports to the district court. 18 U.S.C. § 4247(e)(B). A civilly committed person may also (through counsel or a guardian) petition the court every 180 days for a

4

> hearing to determine whether he should be discharged.
> See 18 U.S.C. § 4247(h).  If the district court
> determines by a preponderance of the evidence that a
> civilly committed person will no longer be sexually
> dangerous to others if released (either unconditionally
> or with a prescribed regimen of medical, psychiatric,
> or psychological care or treatment), then the person
> may be discharged.  18 U.S.C. § 4248(e).

Searcy, 880 F.3d at 120.

On June 18, 2020, Dr. Dawn Graney, a psychologist for the Bureau of Prisons, opined that King would not be sexually dangerous to others if released under a prescribed regimen of care.  See Gov't Ex. 6.  On February 4, 2021, King moved for an expedited status conference to determine why his detainer to Virginia had not been activated.  See ECF No. 111.  He also moved for a challenge hearing pursuant to 18 U.S.C. § 4247(h).  See id.

A challenge hearing was held on August 19, 2021.  Both parties agreed that King should be released.  At the challenge hearing, the parties also agreed that the Virginia detainer should be activated and that King should be sent to the Virginia Department of Corrections to begin service of his five-year sentence.  Following the hearing, the court granted the parties' joint motion directing that King's Virginia detainer be activated and that he be sent to Virginia forthwith.  See ECF No. 136. According to the BOP's website, King was released from the Bureau of Prisons on September 9, 2021.

The government argued that conditional release was appropriate.  Specifically, it asked that King be returned to the

Bureau of Prisons following service of his Virginia sentence "for further evaluation of his sexual dangerousness pursuant to section 4248." ECF No. 130. King, on the other hand, argued that he was no longer a sexually dangerous person and, therefore, his release should be unconditional. King maintained that he does not presently suffer from a serious mental disorder and that even if he did, he would not have serious difficulty in refraining from child molestation if released.

## Analysis

"To obtain a discharge, the committed person carries the burden to show by a preponderance of the evidence that he is no longer sexually dangerous." United States v. Shea, 989 F.3d 271, 276 (4th Cir. 2021). A person is sexually dangerous if "the individual: (1) previously "engaged or attempted to engage in sexually violent conduct or child molestation" (the "prior conduct" prong); (2) currently "suffers from a serious mental illness, abnormality, or disorder" (the "serious mental illness" prong); and (3) "as a result of" that mental condition, the individual "would have serious difficulty in refraining from sexually violent conduct or child molestation if released" (the "volitional control" prong)." United States v. Springer, 715 F.3d 535, 538 (4th Cir. 2013); see also Shea, 276 F.3d at 276. The first or "prior conduct" prong is not at issue. Accordingly, to secure his unconditional release, King must demonstrate by a

preponderance of the evidence that he either does not presently suffer from a mental illness, abnormality, or disorder, and/or that he would not have serious difficulty from reoffending if released.

The court incorporates herein its earlier opinion concerning King's civil commitment which chronicles in greater detail his personal and offense history, as well as the court's reasons for finding him sexually dangerous in 2013.  See Gov't Ex. 3.  It is against this historical backdrop that the court discusses the evidence regarding King's present sexual dangerousness, focusing on his progress or lack thereof for the approximately eight years since he was committed.

At the challenge hearing, three witnesses testified:  King, Dr. Joseph Plaud, and Dr. Graney.  King, who did not testify at his original commitment hearing, was 66 years old at the challenge hearing.  At the time of the hearing, he had been in custody for 16 years.  If not for his commitment under the Adam Walsh Act, King would have been released on June 12, 2009.  See Gov't Ex. 1.

King admitted his sexual offense history and testified that he had not molested any child since 1987.  He expressed remorse for his victims, stating "[t]hat it was a terrible thing that they met me."

7

King discussed his participation in the Commitment and Treatment Program ("CTP") at Butner.  He acknowledged that he briefly enrolled in the program in 2010 but quit after five and a half months.  He reenrolled in the program in 2015 or 2016.  King testified that there are four phases in the CTP and that he was currently in Phase II.

King also testified that he was currently taking Lamictal, a medication to treat his bipolar and obsessive compulsive disorders.  King was not prescribed Lamictal in 2012 at his original commitment hearing.  According to King, the Lamictal had changed his life and the medication helped him make better decisions and think about the consequences of his actions.  King testified that he would continue taking Lamictal if released to Virginia.

King denied any drug or alcohol use in the past nine years, even though drugs and/or alcohol had been available to him during that time period.  King maintained that he would not use drugs or alcohol if released.

King recounted the details of his assault at the hands of another inmate in 2020.  According to King, the inmate tried to kick him to death.  Two bones in his leg were broken and his jaw was broken in two places as well.  Those injuries were extensive and required multiple surgeries.  For example, King testified that his left eye socket was replaced with titanium.  He also

8

testified that the injury to his leg would prohibit him from ever running again.[2]

King testified that he was not sexually attracted to prepubescent children, did not fantasize about them, and that, if released, he would never again molest a child. He stated that he was sexually attracted to grown women. He also testified that he would never commit an act of sexual violence if released.

King admitted to two incidents earlier in the year where he was sitting in his cell nude from the waist down. Both times female guards walked by and saw him. King said he did not make any threatening moves towards the guards and that he did not masturbate after these incidents.

King also had two additional exposure incidents, one in December 2019 and the other in 2016 or 2017. King testified that it was the possibility of being seen naked that he finds arousing. King admitted that while incarcerated he tests the

_____

[2] In her Annual Review dated April 9, 2021, Dr. Graney summarized the extent of King's injuries:

> He suffered multiple facial bone fractures, a fractured jaw, and a fractured left ankle. The respondent required the use of a wheelchair or walker until about late July 2020 due to his left ankle fracture, for which he received physical therapy. In October 2020, he was transported to a local hospital for a "staged reconstruction of left ZMC (mid face) fracture followed by fabrication of custom left orbital floor plate." There were no complications during the procedure or recovery period.

Gov't Ex. 5 at 7.

waters with females in an attempt to "groom" them.  He described

his problems with exposing himself as a way of "courting" and

acknowledged this was wrong and a thinking error on his part.  He

stated he doesn't have much of a sex drive anymore and that he

had exposed himself on the two occasions in 2021 to see if he was

aroused by the behavior.  According to King, he was not.

The two exposure incidents resulted in King's suspension

from the treatment program at Butner for approximately four

months.  When he resumed treatment, he started in Phase II.  King

maintained that when he was released he would seek out treatment

and stated that he would be in treatment for the rest of his life

because he needed the accountability.  King acknowledged that he

had a desire for women to see him nude but testified that he

could control that desire.

King also discussed black book(s) in which he kept pictures

of women.  King said the women in the book were clothed and that

he liked looking at pretty women in clothes.[3]

_____

[3] In his Psychosexual Evaluation Report dated August 28,
2020, Dr. Plaud recounted of one such book from 2014: "There were
also envelopes that had cut out images of adult females inside
along with a handmade book for the cutouts (which were cut from
magazines).  It was noted none of the images found were thought
to be of minors, just adult females in bikinis or dressed in
revealing clothing."  Resp. Ex. 2 at 10.  Of another book King
was found with in 2016, Dr. Plaud wrote: "There was a shakedown
in the unit in June, 2016, and Mr. King was found in possession
of 'a magazine with cutout pictures from other magazines pasted
throughout the pages.'  The images were reported to be of various
women."  Id. at 11.

10

King admitted that he had anger issues that affected his behavior.  For example, he got angry at his doctor on one occasion and stopped taking his medications, including Lamictal.

Dr. Plaud testified that, in his professional judgment, King would not satisfy the criteria for being a sexually dangerous person in 2021.[4]  Dr. Plaud did not believe that King was currently suffering from pedophilic disorder in 2021.  According to Dr. Plaud, pedophilia refers to recurrent and intense sexually-arousing fantasies, urges or behavior involving sexual activity with children.  Dr. Plaud saw no evidence of recurrent or intense sexually-arousing fantasies or urges or behaviors involving sexual activity specific to prepubescent children.

Regarding the court's earlier finding that King suffered from exhibitionism disorder, Dr. Plaud testified that he was not prepared to make a clinical diagnosis of exhibitionism although he understood how one could make one.  According to Dr. Plaud, King's exhibitionism was less a sexual disorder and tied more to his bipolar disorder.  He characterized King's exposure incidents while committed as "passive" exposures.  Dr. Plaud opined that a person truly suffering from exhibitionism would seek out more "active" exposures, like exposing himself in the cafeteria or the

_____

[4] Dr. Plaud testified on King's behalf at his original commitment hearing.  <u>See</u> Gov't Ex. 3 at 30-34.  Dr. Plaud is a licensed psychologist with a Doctorate of Philosophy in Clinical Psychology from the University of Maine.  <u>See</u> Resp. Ex. 1.  Dr. Plaud's curriculum vitae is found at Respondent's Exhibit 1.

quad where everyone can see him instead of his cell where he is alone.

Dr. Plaud also testified that even if the court were to find that King suffered from exhibitionism, that would not make him a sexually dangerous person under the Act. According to Dr. Plaud, in King's case, such behavior while "stupid" was not sexually dangerous. Passive exposures of the type that King had engaged in while incarcerated would not qualify as acts of sexual violence. Dr. Plaud stated that exhibitionism antecedent to direct aggressive contact, menacing behavior or the like might show a lack of control under the Act but that such additional behavior was missing in King's case. Regarding King's conduct in the 1980's wherein exposure would sometimes lead to sexual contact, Dr. Plaud believed that King was in a fundamentally different place in 2021.

Dr. Plaud did not believe that King suffered from antisocial personality disorder. He also did not believe that King suffered from an alcohol or substance abuse disorder. In so finding, he noted there was no evidence that King had participated in consuming alcohol or drugs while incarcerated. In any event, Dr. Plaud did not believe that substance abuse in King's past had played a role in his sexual behavior.

According to Dr. Plaud, King did continue to suffer from bipolar disorder in 2021. Dr. Plaud felt that King's bipolar

12

disorder explained much of his behavior, including some of his sexual offenses and exposure episodes. Ultimately, however, Dr. Plaud did not believe that King had a serious mental disorder for purposes of the Adam Walsh Act.

Nor did Dr. Plaud believe that King would have serious difficulty refraining from molesting a child or engaging in an act of sexual violence in the future. In support of his opinion, he pointed to: (1) the fact that King's one offense involving hands-on contact with a prepubescent victim happened more than thirty years ago; (2) King's exhibitionism had decreased over time and exposures had been infrequent and passive; (3) King was taking medication to address his bipolar disorder; (4) King's advanced age; (5) King's willingness to participate in treatment while committed; and (6) King's lingering medical issues from the 2020 assault.

Dr. Plaud found significant that King was 66 years old at the hearing and would be 70 or 71 before he was released from Virginia. According to Dr. Plaud, the single greatest predictor in assessing future recidivism for sexual offenders is age and that, by age 60, the rate of recidivism is below five percent. He testified that by age 70, the recidivism rate is close to zero. Dr. Plaud also felt that King's continued use of Lamictal to treat his bipolar disorder was further evidence that King would be able to moderate his behavior if released.

Ultimately, Dr. Plaud testified that King was not sexually dangerous in 2021 nor would he be sexually dangerous in five years.

In addition to his testimony at the hearing, Dr. Plaud also prepared a written psychological and psychosexual evaluation of King dated August 28, 2020.  See Resp. Ex. 2 at 1.  In preparing that evaluation, Dr. Plaud "reviewed relevant records concerning Mr. King's history, including his family, developmental, medical and social histories[,] . . . his general and sexual offense histories[,] . . . [and] also considered his psychological treatment and institutional histories."  Id.  Dr. Plaud also conducted a clinical interview of King on August 4, 2020.  See id.  Dr. Plaud's evaluation was "a present-day psychological and psychosexual risk assessment . . . focused upon whether or not at this time, in August 2020, Mr. King is at such a risk to re-offend in a sexual manner if not confined to a secure facility that he should be considered to meet the statutory criteria under 18 U.S.C. § 4248 to be considered a sexually dangerous person." Id.

Dr. Plaud concluded that King was not a sexually dangerous person in August 2020.  See id. at 2-3 ("[I]t is my professional conclusion that Mr. King is not a sexually dangerous person who requires ongoing institutional confinement.  It is my professional judgment . . . that Mr. King would not at this time,

14

in August, 2020, have serious difficulty in controlling his
sexual impulses and behavior, and therefore engage in a further
act or act of child molestation/sexual violence if not confined
to a secure facility."). Dr. Plaud cited the following factors
in support of his conclusion:

1.  Mr. King has significant and sustained
    participation in psychological sexual offender
    treatment since October, 2015, which serves as a
    major protective factor in the present case. His
    past and ongoing participation in psychological
    treatment is a good predictor of his ongoing plans
    to continue such participation in an identified
    outpatient setting, the more appropriate setting
    at this point for ongoing services.

2.  Mr. King has attained the age of 65, an age cohort
    associated with the lowest levels of offender
    recidivism. His social and sexual maturation are
    consistent with expected benchmarks of
    developmental progress consistent with his current
    age. It is my professional opinion that as a
    younger man Mr. King was socially and sexually
    immature, and this was a risk factor at that time
    for his committing sexual offenses.

3.  Mr. King shows ongoing sexual and general
    behavioral regulation and control, and since the
    significant physical injuries he sustained at the
    hands of another resident of FCI-Butner, his
    awareness of his own need to engage in productive
    behavior moving forward has increased.

Resp. Ex. At 3.

Dr. Graney testified that she had been preparing King's
annual review reports since 2014.[5] Dr. Graney diagnosed King

---

[5] Dr. Graney has been employed as a Sex Offender Forensic
Psychologist at FCI Butner since September 2008. See Gov't Ex.
4. She received a Doctorate in Psychology ("Psy. D.") from the
California School of Professional Psychology-Fresno in 2001. See

with pedophilic disorder, exhibitionism disorder, obsessive compulsive disorder, unspecified bipolar disorder, and antisocial personality disorder. Dr. Graney felt that King's exhibitionistic disorder met the criteria for prong two of the analysis under the Adam Walsh Act. Dr. Graney's pedophilia diagnosis was based upon the historical information in the case, namely King's documented sexual offenses. Dr. Graney did testify that in the sixteen years that King had been in custody, there was no evidence of recurrent or strong sexual interest in children. King had not been found collecting materials or images of children or pornographic stories involving children nor had he engaged in discussions of that nature with his peers. Dr. Graney noted that sometimes individuals with pedophilic disorder will continue to engage in those behaviors while in custody.[6] Acknowledging that King had not, Dr. Graney was nevertheless concerned how King would behave outside a confined setting.

Dr. Graney felt that King's antisocial personality disorder was the most prominent of his disorders in the prison setting and that it was largely holding him back from progressing in treatment. She testified that King's bipolar disorder seemed to

_____

id. Dr. Graney's curriculum vitae is attached as Government Exhibit 4.

[6] As the Fourth Circuit Court of Appeals has noted, "[w]hile there may be limited opportunities for an inmate to engage in conduct indicative of pedophilic urges, it is not impossible." United States v. Wooden, 887 F.3d 591, 608 (4th Cir. 2018).

be under control with medication.  She also stated that she had
not seen significant indications of his obsessive compulsive
disorder while in custody with the exception of the books that
King would compile.  Dr. Graney described these books as "very
meticulous" collage immages of King's idea of the perfect woman
based upon physical attributes.  According to her, King would cut
images of different body parts from magazines and paste them into
a collage of what he would consider an ideally beautiful woman.
Dr. Graney stated that the images appeared to be adult females
and the majority of them were clothed.  She described the process
in compiling the books as "very time consuming" and stated that
King was "very focused."  Dr. Graney related that she knew of
King's compilation of at least two of these types of books.

     Notwithstanding her belief that King continued to suffer
from these various disorders, Dr. Graney nevertheless felt that
he could be released with conditions.  Acknowledging that King
had had a number of disciplinary incidents while committed, Dr.
Graney noted that most of those were early on in his commitment
and that he had very few incidents in recent years, the majority
of which were nonsexual in nature.

     It was also Dr. Graney's belief that King had not made
significant progress in treatment.  She attributed this lack of
progress not to "specific sexual acting-out behaviors" but to his
personality disorder.  Dr. Graney did testify that one of the

things King had done "really well" in treatment is be very open with treatment staff regarding his sexual urges, difficulties with masturbation, and deviant fantasies.

Dr. Graney acknowledged that King had no history of sexual violence and that although he did have an offense history involving children "there was no indication over the years that that's been persistent or problematic for him."[7]  Ultimately, Dr. Graney felt that King should be released with conditions because he had been "in a contained and controlled environment where he doesn't have access to children" and her "concern would be outside of a treatment setting where there is possible exposure [to children], his ability to appropriately manage those urges and kind of make the best decisions, unless he had some sort of monitoring and supervision in place."

Dr. Graney agreed with Dr. Plaud's proposition that there is a lower risk of recidivism based on age.  However, she was concerned that even as an individual in his mid-60's, King remained quite sexually preoccupied.  In support of her position that King was sexually preoccupied, she pointed to his books, his discussion of deviant sexual fantasies involving adult women,

---

[7] In her Annual Review for 2021, Dr. Graney "noted that since being civilly committed in 2013, [King] had not endorsed nor clearly demonstrated a continued sexual interest in children."  Gov't Ex. 5 at 7.

18

King's admission that he thinks about sex all the time, and his exposure incidents while committed.

Ultimately, Dr. Graney stood by her conclusion in April 2020 that King was an appropriate candidate for release with conditions.

In their reports, both Drs. Plaud and Graney assessed King's risk of reoffending by calculating King's score on the Static-99R, an actuarial tool. See Gov't Ex. 5 at 7-8; Resp. Ex. 2 at 21-22. Both calculated King's score on the Static-99R as a 6 which, according to Dr. Graney, falls into the Well Above Average range of sexual reoffending. See id. Dr. Graney wrote that "[o]n average, offenders with a score of 6 have a sexual recidivism rate that is approximately 3.8 times higher than the recidivism rate of the typical sex offender (defined as a median Static-99R score of 2). When compared to the Routine sample (which is considered roughly representative of all adjudicated sex offenders), individuals with a Static-99R score of 6 sexually reoffend at a rate of 20.5% within 5 years." Gov't Ex. 5 at 7-8. Of the limits of tests like the Static-99R, the United States Court of Appeals for the Fourth Circuit has noted:

> Such actuarial tests, however, only gauge a risk of recidivism based upon the statistics of the particular group of sex offenders selected for comparison. According to the evidence presented, knowing the recidivism rate of a particular group does not mean that the individual under consideration poses the same chance of recidivism in the same time frame; his risk could be higher or lower than that of the

> group based upon the unique circumstances of his case.
> Thus, experts using these tools also consider, among
> other things, the age of the particular offender, his
> participation in treatment, his compliance with such
> treatment, his history of reoffending after treatment,
> and his commitment to controlling his deviant behavior.

United States v. Hall, 664 F.3d 456, 464 (4th Cir. 2012).

Based upon the entire record, the court concludes that King has shown by a preponderance of the evidence that, even if he presently suffers from a serious mental disorder, he would not have serious difficulty in refraining from sexually violent conduct or child molestation if released.[8] "[T]he 'serious difficulty' prong of 4248's certification proceeding refers to the degree of the person's 'volitional impairment,' which impacts the person's ability to refrain from acting upon his deviant sexual interests." United States v. Hall, 554 F.3d 456, 463 (4th Cir. 2012) (citing Kansas v. Hendricks, 521 U.S. 346, 358 (1997)). This inquiry "will not be demonstrable with mathematical precision." Kansas v. Crane, 534 U.S. 407, 413 (2002). In weighing the serious-difficulty prong, it is appropriate to consider the following factors: failures while on supervision, resistance to treatment, continued deviant thoughts, cognitive distortions, actuarial risk assessments, impulsiveness, and historical offenses. See United States v. Wooden, 693 F.3d

---

[8] Given its ruling, the court does not specifically address whether King continues to suffer from a serious mental disorder under the Act.

20

440, 462 (4th Cir. 2012). And when considering "whether an
inmate suffering from pedophilia will have serious difficulty in
refraining from re-offending if released, consideration of the
nature of his prior crimes provides a critical part of the
answer." Id. at 458. The frequency and nature of an inmate's
prison infractions is also relevant. See id.

In particular the court notes that both experts agreed that
there was no evidence since 2013 that demonstrated any continued
sexual interest in children on King's part. King testified that
he was not sexually interested in children and denied fantasizing
about them. At the time of the hearing, King had also been in
sex offender treatment for approximately six years and had made
some progress in that regard. King testified that he would
continue treatment if released. Significantly, King has also
been taking Lamictal for a number of years and has reported
improved mood stability and behavioral control while on the
medication. King acknowledged his prior crimes and has shown
remorse for his victims. Finally, the court believes that King's
advanced age is a factor that suggests he would be able to
control his behavior if released. Both Drs. Plaud and Graney
acknowledged the low recidivism rates for an individual King's
age.

While the court is concerned about King's recent exposure
incidents, it cannot include that those incidents demonstrate

that he would have serious difficulty refraining from child molestation if released. Furthermore, both experts conceded that these incidents were not sexually violent conduct.[9] In other words, there is no present evidence of a sufficient connection between King's exhibitionistic episodes and an inability to refrain from child molestation or sexually violent conduct.

Dr. Graney's concerns regarding King's inability to refrain from engaging in child molestation are grounded almost entirely in his sexual offense history. However, this court cannot

_____

[9] "Sexually violent conduct," for purposes of § 4248, is defined in 28 C.F.R. § 549.92, which provides as follows:

"[S]exually violent conduct" includes any unlawful conduct of a sexual nature with another person ("the victim") that involves:

(a) The use or threatened use of force against the victim;
(b) Threatening or placing the victim in fear that the victim, or any other person, will be harmed;
(c) Rendering the victim unconscious and thereby engaging in conduct of a sexual nature with the victim;
(d) Administering to the victim, by force or threat of force, or without the knowledge or permission of the victim, a drug, intoxicant, or other similar substance, and thereby substantially impairing the ability of the victim to appraise or control conduct; or
(e) Engaging in such conduct with a victim who is incapable of appraising the nature of the conduct, or physically or mentally incapable of declining participation in, or communicating unwillingness to engage in, that conduct.

28 C.F.R. § 549.92; see also United States v. Castle, NO. 5:17-HC-2204-FL, 2018 WL 3762990, at *9 (E.D.N.C. Aug. 8, 2018). There is no evidence in this case that King has engaged in sexually violent conduct within the meaning of the Act or that he would have serious difficulty in refraining from such conduct.

consider historical facts to the exclusion of present behavior because such reliance on past behavior does "not allow for a respondent's subsequent growth."  United States v. Antone, 742 F.3d 151, 169 (4th Cir. 2014).[10]

### Conclusion

As the United States Court of Appeals for the Fourth Circuit has noted, "[t]he question of whether a person is sexually dangerous is by no means an easy one . . . and the potential consequences of an incorrect decision are steep—a loss of liberty if an inmate is wrongly found to be sexually dangerous or unspeakable harm to a child if an inmate is wrongly released." United States v. Wooden, 887 F.3d 591, 610 (4th Cir. 2018).  In this case, however, upon consideration of all the evidence, the court finds that King has established by a preponderance of the evidence that he would not be sexually dangerous to others if released.  The evidence demonstrates that King would not have

---

[10] As the Fourth Circuit noted, relying exclusively on past pedophilic behavior to show that an individual has current pedophilic urges

> would effectively mean that an offender diagnosed with pedophilic disorder could never be released, as the government could always prove future impulse control problems by pointing to past failures to exercise control.  The structure of the Act, which requires discharge if the inmate is no longer sexually dangerous, clearly shows that Congress believed that sexually dangerous predators could change and grow out of the sexually-dangerous classification.

United States v. Wooden, 887 F.3d 591, 607 (4th Cir. 2018).

serious difficulty in refraining from sexually violent conduct or child molestation if released. Because the court finds King has shown that he is not a sexually dangerous person, he must be released unconditionally. See id. at 609 ("A conditional release thus is authorized only for those detainees who require medical care or treatment to keep them from being sexually dangerous; a detainee who is not sexually dangerous must be discharged unconditionally.").[11]

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record.

**IT IS SO ORDERED** this 18th day of November, 2022.

ENTER:

David A. Faber
Senior United States District Judge

---

[11] For this reason, the court denied the government's motion for conditional release and to hold this matter in abeyance pending satisfaction of state sentence. See ECF No. 143.